UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      -against-                           1:07-CR-180 (LEK)

RAFAEL PABON,

              Defendant.

_____

### MEMORANDUM-DECISION AND ORDER[1]

Defendant Rafael Pabon ("Pabon" or "Defendant") is charged in a one count indictment with, having been previously convicted of crimes punishable by imprisonment for a term exceeding one year, knowingly and intentionally possessing in and affecting interstate commerce a firearm, in violation of 18 U.S.C. §§ 922 (g)(1) and 924 (a)(2). Indictment (Dkt. No. 1). Defendant was arraigned before U.S. Magistrate Judge David R. Homer on April 20, 2007. Defendant seeks to suppress statements made by him to police officers and evidence seized from his person pursuant to his arrest on January 19, 2007. Dkt. Nos. 19, 22. An evidentiary hearing was held on September 24, 2008, October 7, 2008, and December 17, 2008.

### I. Background

On or about June 27, 2006, a New York State Parole Officer executed a document detailing behavior which violated the Defendant's parole conditions and indicating that Defendant's whereabouts were unknown and that efforts would be made to apprehend him. An

_____

[1] For printed publication by the Federal Reporters.

1

arrest warrant was issued for Pabon on June 28, 2006 alleging a violation of parole.  In January

2007, New York State Parole Officer Bob Georgia received information that Pabon was residing

at the Yates Village Apartment complex in Apartment H-22.  The police obtained written

consent to search from the legal resident of Apartment H-22 ("CI").  CI then told Pabon via cell

phone that she needed to get into Apartment H-22 but did not have a key.  Pabon sent CI the key

via another individual, Toni Yager.

Following a search of Apartment H-22, a bag was located containing a handgun, clothing,

and a Mid-State Correctional Facility ID Card.  CI then called Pabon's cell phone again, and he

instructed her to return the key to Apartment F-6, which belonged to Yager.  CI went to

Apartment F-6, met with Pabon, and gave him the key.  After she left, she contacted the officers

and told them that Pabon was alone in Apartment F-6.  The officers received written consent to

enter Apartment F-6 from Yager, and found and arrested Pabon there.  They seized from him his

cell phone and the key to Apartment H-22.  Following his arrest, Pabon made statements prior to

being advised of his Miranda rights indicating, in sum and substance, that he was residing at

Apartment H-22.

## II.  Analysis

A.     **Statement made to law enforcement regarding residence**

1.     **Facts**

Pabon was taken to police headquarters at approximately 11:40 a.m. on January 19, 2007.

Mantei Test. at 100 (Dkt. No. 30).  He was then placed in a holding cell while Detective David

Mantei ("Mantei") completed paperwork to process Pabon's arrest.  Id. at 41.  The typical

booking process involves the generation of paperwork while the individual is placed in a holding

cell.  Id. at 41.  That paperwork consists of an incident report, a master name file, and other

information, which is then taken to the desk sergeant so that he can begin the booking process.

Id.  After that, it is up to the detective or whoever is handling the case as to when or whether to

bring the individual up for an interview.  Id.  Mantei testified that he always makes it a point to

interview individuals.  Id. at 42.  In this case, Mantei had filled out the incident report and the

advice of rights form when Pabon was brought up for his interview.  Id.  The advice of rights

form is a standard form used within the department to give an individual their Miranda warnings

prior to any interview.  Id.

At approximately 3:00 or 3:30, Pabon was brought to an interview room.  Id. at 43.  On

the top of the form is a section for pedigree information, including "name, birthdate, address,

social security number, etcetera."  Id. at 45.  That information was obtained from Pabon.  Id.

Mantei asked Pabon his name, and he said Rafael Pabon.  Id. at 47.  Mantei then asked about a

middle initial, which Pabon provided.  Id.  Mantei then asked Pabon for his date of birth, which

Pabon provided.  Id.  Mantei next asked Pabon what his address was, and Pabon stated F-6.  Id.

Mantei then asked if Pabon was also staying at H-22, and Pabon answered in the affirmative.  Id.,

Id. at 110.

After asking the rest of the questions and filling out the pedigree information, Mantei

advised Pabon of his Miranda rights.  Id. at 48-50.  After Pabon stated that he understood

everything, Mantei asked Pabin if he wanted to give a statement and talk about the pending

issues. Id. at 50.  Pabon "said no.  He said something about, I have little time on parole and you

guys can't put that gun on me." Id. at 51.

### 2.      Relevant Law

A suspect in custody of the police must be advised of his basic constitutional rights

before he is subjected to interrogation.  Miranda v. Arizona, 384 U.S. 436 (1966).  However, the

Supreme Court has since stated that "interrogation" does not include actions or questions

"normally attendant to arrest and custody. . ." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Accordingly, the Supreme Court has stated that the "'routine booking question' exception []

exempts from Miranda's coverage questions to secure the 'biographical data necessary to

complete booking or pretrial services.'" Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990)

(citation omitted).  Therefore, questions that are "requested for record-keeping purposes only"

would "fall outside the protections of Miranda and the answers thereto need not be suppressed."

Id. at 601-02 (quotations omitted).  Permissible questions are those that "appear reasonably

related to the police's administrative concerns." Id.

The Second Circuit has expanded on this law and permitted pedigree questions–those

"normally and reasonably related to police administrative concerns"–even if the information

gathered turns out to be incriminating, and added that if the officer perceives that a specific piece

of information provided is incorrect, "then it is not only reasonable, but arguably the officer's

duty, to inquire further." Rosa v. McCray, 396 F.3d 210, 221-22 (2d Cir. 2005).

### 3.      Analysis

The Defendant argues that this analysis is not relevant because the "booking" procedure

ended when Mantei completed the Incident Report and the Master Name.  Deft's Reply to Govt's

Response at 1-2 (Dkt. No. 45).  However, the distinction between a permissible and

impermissible question does not depend on the filing of a piece of paper or some time-span the

Defendant argues is sufficient for "booking."  This formalistic distinction would allow for too

much discretion and abuse during the "booking" process.  Rather, the Second Circuit has made

clear that the exception (perhaps more accurately described as a pedigree question exception)

"does not mean that any question asked during the booking process falls within that exception"

and that "the police may not ask questions, even during booking, that are designed to elicit

incriminatory admissions."  Rosa, 396 F.3d at 222 (citations and alterations omitted).

Therefore, the question before the Court is not whether the booking process was still

going on, but whether the question constituted "interrogation" because it was designed to elicit

an incriminatory admission or whether it was a pedigree question of the type "normally and

reasonably related to police administrative concerns."  In Rosa v. McCray, the officer had asked

the defendant his hair color, and when given the answer "blond," asked "what is your real hair

color?"  396 F.3d at 213.  The state court found that the questions asked by the detective "were

asked for legitimate processing purposes and that their intent was to obtain accurate information,

as distinct from incriminating information" and noted that the question "clearly corresponded to

portions of the form that were being filled out."  Id. at 215.  The Second Circuit affirmed the

appellate division, noting that the officer was engaged in a routine administrative process and

that the questions were presented to the defendant in the exact order that the questions appeared

on the form and without substantive deviation from the form of the questions presented.  Id. at

222-23.  The Second Circuit also noted that the question–"what is your real hair color?"–was

narrowly crafted by the officer to obtain information necessary to complete the form,

distinguishing it from "when did you dye your hair?"  Id. at 223.

Similarly, the question in this case was narrowly tailored to clarifying whether Pabon's

address included Apartment H-22 and was not "but didn't you have belongings at H-22 too?"  In

addition, the form was filled out as part of Mantei's standard procedure and the questions were

asked in order corresponding to the order in which the questions appeared on the form.  Mantei

testified that he "always make[s] it a point to interview" an individual or defendant following the

completion of the paperwork and that the "pedigree information" on the advice of rights form is

obtained by asking the defendant.  Id. at 42, 45.  The Court further notes that Mantei similarly

had to seek clarification or elaboration from Pabon when he failed to volunteer complete

information regarding his name and had to be asked about his middle initial.  Mantei testified

regarding his intent that he was "[t]rying to be accurate.  That's how I try to do things."  Mantei

Test. at 120.

The Court finds that the question was of the sort of questions "normally attendant to

arrest and custody."  Innis, 446 U.S. at 301.  The Court further finds that the question asked by

the detective was asked for legitimate processing purposes and that Mantei's intent was to obtain

accurate biographical information, as distinct from incriminating information.  The question was

a pedigree question intended to obtain basic identifying data rather than an interrogation of an

investigative nature.  Accordingly, the question was "requested for record-keeping purposes" and

therefore "fall[s] outside the protections of Miranda and the answers thereto need not be

suppressed."  Muniz, 496 U.S. at 601-02.  Mantei's knowledge that the address information

initially provided was incorrect or incomplete and even the possibility that the complete

information might prove to be incriminating is insufficient in this case to convert the pedigree

question into the investigative sort of question which would require Miranda warnings.  McCray,

396 F.3d at 221-22 (finding that if the officer perceives that a specific piece of information

provided is incorrect, "then it is not only reasonable, but arguably the officer's duty, to inquire

further." ); see also U.S. v. Carmona, 873 F.2d 569, 573 (2d Cir. 1989) (noting that "obtaining

such pedigree information has not been viewed as unlawful custodial interrogation" despite the

officer's prior knowledge of the suspect's pedigree information); United States v. Adegbite, 846

F.2d 834, 838 (2d Cir. 1988) ("We have held, however, that the solicitation of information

concerning a person's identity and background does not amount to custodial interrogation

prohibited by [Miranda], whether that solicitation occurs before or after Miranda warnings are

given.") (citations omitted); United States ex rel. Hines v. LaVallee, 521 F.2d 1109, 1112 (2d

Cir. 1975), cert. denied, 423 U.S. 1090 (1976) (even where answer to officer's question about a

suspect's identity and background "may in a particular context provide the missing link required

to convict," the information is nevertheless admissible under Miranda).


B.      **Statement made to law enforcement regarding gun**

1.      **Facts**

After Pabon was informed of his Miranda rights by Mantei, he stated that he understood

them, and signed the form indicating that he understood his rights.  Mantei Test. at 50, 111.

Mantei then asked Pabon if he wanted to give a statement, and Pabon replied "something to the

effect, I'm not giving no statement, I don't have much time left on parole and you guys can't put that gun on me." Id. at 112, 51.

### 2. Analysis

As Miranda itself recognized, "[v]olunteered statements of any kind are not barred by the Fifth Amendment" and, thus, do not require preliminary advice of rights. Miranda v. Arizona, 384 U.S. at 478 ("There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make." (footnote omitted)). In Edwards v. Arizona, the Supreme Court explained that, even if a defendant has asserted his Fifth Amendment right to counsel, if the defendant "himself initiates further communication" with law enforcement, "nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." 451 U.S. 477, 485 (1981).

In this case, Pabon's statement regarding the police "put[ting] that gun on me," made after indicating that he did not want to make a statement, was a spontaneous voluntary statement, not made in response to any question or interrogation by the police. Accordingly, the statement is admissible.


## C.    Evidence seized from Pabon following his arrest

It is well settled that unless a carefully defined exception clearly applies, a warrantless search is "per se unreasonable." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citing

Katz v. United States, 389 U.S. 347, 357 (1967)).  One recognized exception to the warrant

requirement is a search that is conducted pursuant to consent.  Schneckloth, 412 U.S. at 219.  "So

long as the police do not coerce consent, a search conducted on the basis of consent is not an

unreasonable search."  United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995).  The prosecution

bears the burden of proving that consent was voluntarily given.  Schneckloth, 412 U.S. at 222.  In

determining whether or not consent to a search was freely given, the Court must look at the

totality of the circumstances surrounding the obtaining of the consent.  Id. at 227.  While the

government's burden is not satisfied by showing a mere submission to a claim of lawful

authority, Florida v. Royer, 460 U.S. 491, 497 (1983), consent need not be expressed in a

particular form but can be found from an individual's words, actions or conduct.  United States v.

Duetsch, 987 F.2d 878, 883 (2d Cir. 1993) (internal quotations and citations omitted).

Defendant here argues that the cell phone and key seized from his person during his arrest

must be suppressed because the police did not have the authority to enter Yager's residence for

the purpose of arresting him without a search warrant.  Deft's Post-Hearing Memo. at 6 (Dkt. No.

37).  Defendant claims, without legal citation, that because the consent to search was involuntary,

the entrance into Apartment F-6 was illegal and the arrest was therefore illegal, making the

search incident to arrest illegal and warranting suppression.  Id.  The government argues that the

evidence should not be suppressed because (1) Pabon did not have a sufficient connection to

Apartment F-6 to afford him standing to assert Fourth Amendment challenges to the search, (2)

Pabon cannot vicariously assert Toni Yager's rights, (3) Pabon, as a parolee, does not have a

legitimate expectation of privacy, and (4) because Yager's consent to search the apartment was

9

valid.  Gov't Memo. in Response (Dkt. No. 42).  Each of these arguments, although related to each other, will be considered below.

### 1. Pabon's connection to Apartment F-6

"[T]o claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."  Minnesota v. Carter, 525 U.S. 83, 88 (1998).  Thus, for example, an overnight guest may raise a Fourth Amendment objection to a warrantless search of the host's home. United States v. Osorio, 949 F.2d 38, 42 (2d Cir. 1991).  However, a defendant's presence for the sole purpose of a business transaction, such as selling drugs, does not give rise to a Fourth Amendment interest.  Carter, 525 U.S. at 86, 89.

The Government argues that no evidence was presented at the suppression hearing to establish that the Defendant was a resident, overnight guest, or otherwise had a sufficient connection to Apartment F-6 to afford him standing to contest the constitutionality of the search of the address for his person.  Defendant counters the Government's argument by stating that evidence existed to establish that Pabon "lived or was an overnight guest at apartment F-6." Deft's Reply to Govt's Response at 4 (Dkt. No. 45).  However, the evidence referred to by the Defendant as establishing his residence or guest-status in Apartment F-6 was all established after or because of his arrest there: (1) defendant was arrested in apartment F-6, (2) Mantei, as part of the booking process, filled out Pabon's address on the Incident Report as including Apartment F-6, and (3) as part of the Miranda Advice of Rights form, Pabon stated that his address was F-6. Id. at 3.

Initially, the Court notes that if it were to credit this claim that Pabon lived or was an overnight guest in Apartment F-6, then the police's entry into the Apartment in order to carry out the arrest warrant would have been proper.  In Payton v. New York, the Supreme Court held that an arrest warrant alone was sufficient to authorize the entry into a person's home to effect his arrest when there is reason to believe the suspect is within.  445 U.S. 573, 602-03 (1980).  Accordingly, if Pabon was living in Apartment F-6, as he later claimed to Mantei, then the arrest warrant alone was sufficient to authorize the police's entry into Apartment F-6, since they were informed by an eye-witness that Pabon was in that Apartment immediately after she left the doorway of the apartment where she had returned to Pabon the key to Apartment H-22.  Mantei Test. at 34-35.

In contrast, evidence presented at the hearing showed that Pabon was staying and sleeping in the second floor rear bedroom of Apartment H-22, Mantei Test. at 19 ("That was his room, so to speak."), and Pabon's clothing bag, clothing, identification, and firearm were found in the same bedroom. Mantei Test. at 29-32.  The Court finds that Defendant's presence in Apartment F-6 when he was arrested is insufficient to give rise to a Fourth Amendment interest.  See Carter, 525 U.S. at 86, 89.  In addition, the Court finds that the officer's indication on the Incident Report that Defendant's address included Apartment F-6 or Pabon's statements to the police after his arrest stating that his address was at Apartment F-6 are also insufficient to give rise to a Fourth Amendment interest.  As noted above, if they were sufficient, Pabon's argument fails because the police would have been authorized under Payton to enter the apartment to carry out the arrest warrant.  Because Pabon lacked a reasonable expectation of privacy in Apartment F-6,

he is unable to claim the protection of the Fourth Amendment to challenge his seizure there.

### 2.      Vicarious assertion of Toni Yager's rights

Defendant relies on Steagald v. United States, 451 U.S. 204 (1981) for the argument that

the police did not have the authority to enter Apartment F-6 in order to arrest the Defendant.

Deft's Post-Hearing Memo. at 6.  The Court in Steagald held that the Fourth Amendment

protects a third party not named in an arrest warrant from intrusion into his home without a

search warrant, but it declined to extend this protection to the person named in the arrest warrant

who was apprehended in the third party's home.  451 U.S. 204, 219 (leaving open the question

"whether the subject of an arrest warrant can object to the absence of a search warrant when he is

apprehended in another person's home.").  In addition, the Supreme Court had explicitly

distinguished between the effect of the arrest warrant on the person being arrested–noting that the

arrest warrant made his seizure reasonable–versus its effect on the person whose home was

entered–noting that the arrest warrant did not permit the search of the home.  451 U.S. 204, 213

("while the warrant in this case may have protected [arrestee] from an unreasonable seizure, it

did absolutely nothing to protect petitioner's privacy interest in being free from an unreasonable

invasion and search of his home.").

Accordingly, other circuits have extended this reasoning to find that where a defendant

was arrested pursuant to a valid arrest warrant while in the home of a third party without a search

warrant for the third party's home, the defendant's Fourth Amendment rights were not violated.

United States v. Agnew, 407 F.3d 193, 196-97 (3d Cir. 2005); United States v. Kaylor, 877 F.2d

658, 663 n. 5 (8th Cir. 1989); United States v. Underwood, 717 F.2d 482, 483-86 (9th Cir. 1983)

(en banc ); United States v. Buckner, 717 F.2d 297, 299-300 (6th Cir. 1983).  But see United

States v. Weems, 322 F.3d 18, 23 n. 3 (1st Cir. 2003).  Relying on Steagald, the Third Circuit

explained that the lack of a search warrant violated the Fourth Amendment rights of the third

party, "[b]ut this right is personal to the home owner and cannot be asserted vicariously by the

person named in the arrest warrant."  Agnew, 407 F.3d at 196-97.  The Second Circuit referred to

this analysis favorably in United States v. Snype, 441 F.3d 119, 132 (2nd Cir. 2006), explaining

that the other circuits extended Steagald's logic because:

> (a) Fourth Amendment rights are personal and cannot be asserted vicariously, and
> (b) requiring police who already hold an arrest warrant for a suspect to obtain a
> search warrant before they can pursue that suspect in a third party's home would
> grant the suspect broader rights in the third party's home than he would have in
> his own home under Payton.

441 F.3d at 133.  The Court finds this reasoning persuasive.  Yager's Fourth Amendment rights

are personal to her, and Pabon cannot assert them.  If he were living in Apartment F-6 as he

claimed after his arrest there, he would have had his own rights to be free from unreasonable

search in the apartment, but the arrest warrant would have addressed those rights under Payton.

Based on the Supreme Court's discussion in Steagald, the arrest warrant addressed Pabon's

Fourth Amendment right to be free from unreasonable seizure.  451 U.S. at 213.  Although the

arrest warrant did not address Yager's right to be free from search in her home, Yager's right to

be free from unreasonable searches does not overcome the arrest warrant's effect on Pabon's

Fourth Amendment rights.  A contrary conclusion would indeed grant Pabon broader rights in a

third person's home than he would have had in his own home.  Under this analysis, Pabon's

arrest in Yager's apartment did not violate his Fourth Amendment rights.

13

### 3.    Pabon's status as a parolee

Pabon, because of his status as a parolee, has a diminished expectation of privacy.  In

Samson v. California, 547 U.S. 843 (2006), the Supreme Court upheld a police officer's

suspicionless search of a parolee pursuant to a state statute without considering whether the

search was justified by a special need.  See id. at 852 n. 3; cf. Griffin v. Wisconsin, 483 U.S. 868,

872-73 (1987) (upholding a warrantless search of a probationer's residence based on reasonable

suspicion because the state's special need for adequate supervision of the probationer's

compliance with probation conditions outweighed the probationer's legitimate expectation of

privacy).  The Court in Samson emphasized that parolees "have severely diminished expectations

of privacy by virtue of their status alone."  Id. at 852.  See also Griffin, 483 U.S. at 875 (parolees

are subject to "a degree of impingement upon privacy that would not be constitutional if applied

to the public at large").  It then "conclude[d] that [parolees] d[o] not have an expectation of

privacy that society would recognize as legitimate."  Samson, 547 U.S. at 852.

The Second Circuit has also stated that parolees do not have an expectation of privacy

that society is prepared to recognize as reasonable.  United States v. Massey, 461 F.3d 177, 179-

80 (2d Cir. 2006) (parolee's reasonable expectation of privacy less than that of ordinary citizen);

United States v. Grimes, 225 F.3d 254, 258 (2d Cir. 2000) (parole justifies some departure from

traditional Fourth Amendment standards).  The Second Circuit has observed that when, as in this

case, a parolee is charged with violating his parole conditions and a warrant for his arrest has

been issued, the parolee is removed "one step farther from the constitutional protection enjoyed

by ordinary citizens."  U.S. v. Polito, 583 F.2d 48, 55 (2d Cir. 1978).

14

Pabon, as a condition of his parole also signed a waiver allowing a parole officer to

search him or his home at any time pursuant to N.Y. Comp. Codes R. & Regs. Tit. 9, §8003.2(d),

which would further diminish his expectation of privacy.[2]  Certainly to the extent that Pabon's

statement to Mantei possibly established that he was staying in Apartment F-6, the police's entry

into the apartment did not violate his Fourth Amendment rights.

Nonetheless, even without any connection to Apartment F-6, Pabon does not have a

sufficient expectation of privacy that society is prepared to recognize as reasonable and he

therefore does not have sufficient standing to assert a Fourth Amendment challenge to the

police's entrance into Yager's apartment.  Minnesota v. Olson, 495 U.S. 91 (1990); United States

v. Massey, 461 F.3d 177 (2nd Cir. 2006).  In Olson, the defendant, who held the status of a guest,

was arrested in a third person's home without a warrant.  495 U.S. at 95.  The Supreme Court

held that the defendant had standing to challenge the intrusion into the third person's home

because he had an expectation of privacy as a guest which that society recognizes as reasonable.

Id. at 95-96.  In contrast, the Second Circuit in United States v. Massey permitted the search of a

parolee's home without a warrant and his arrest for possession of a firearm.  Massey, 461 F.3d at

178.  It found the search and seizure valid since "parolees, by virtue of their status, do not have

an expectation of privacy that society would recognize as legitimate."  Id. at 180 (Miner, J.

concurring) (quoting Samson, 547 U.S. at 852).  The court added that this reduced expectation of

---

[2] Defendant is subject to warrantless and suspicionless searches because he has submitted to
this condition in accordance with New York State Parole Regulations.  According to the New York
State Compilation of Codes, Rules and Regulations, one of the conditions of parole in New York
State is that "a releasee will permit his parole officer to visit him . . . and will permit the search and
inspection of his person, residence and property."  N.Y. Comp. Codes R. & Regs. Tit. 9, §8003.2(d).

privacy is further diminished, where as a condition of his parole, the parolee has signed a waiver

allowing a parole officer to search him at any time.  Id. at 179.

Parole officers are vested "with authority to search parolees in situations which would be

impermissible if directed against ordinary citizens" by a police officer.  United States ex rel

Santos v. N.Y.S. Board of Parole, 441 F.2d 1216, 1218 (2nd Cir. 1971). For example, in United

States ex rel Santos, a New York State Parole Officer obtained a parole warrant for a parolee

suspected to be in violation of his parole condition and searched the parolee's home without a

search warrant or consent.  Id. at 1217.  Upon the parolee's motion to suppress, the Second

Circuit held that a "search which would be unlawful if directed against an ordinary citizen may

be proper if conducted against a parolee" since a parole officer needs only reasonable grounds to

believe that a parolee is in violation of his parole conditions before he may use a parole warrant

to search the parolee's home.  Id. at 1218.

In this case, the search did not violate Pabon's rights because it was based on a parole

warrant since he was known to be in violation of his parole.  See Mantei Test. at 7-8.  Balancing

Pabon's diminished Fourth Amendment rights with the State's interest in his supervision, the

search in this case is more reasonable than the search approved in Santos because Pabon was not

only suspected to be in violation of his parole like the parolee in Santos, but rather was a known

absconder in direct violation of his parole.  Mantei Test. at 7.[3]

---

[3] The presence of the police for the search and/or arrest does not alter the Court's analysis.
A parole officer may make a valid search of a parolee in violation of his parole without an arrest or
search warrant as long as the search is reasonably and rationally related to the performance of the
parole officer's duties, and the parole officer may be assisted by police in affecting the search since
their duties and responsibilities are frequently intertwined.  United States v. Newton, 369 F.3d 659,
665-67 (2nd Cir. 2004) (holding that warrantless search by parole officer did not violate the Fourth

Insofar as Pabon claims that he was staying in Apartment F-6, the Court finds that Pabon

cannot challenge the police's entrance into Apartment F-6 because he had previously consented

to have his residence searched when he signed the parole conditions of release.  It is well settled

that "persons on supervised release who sign such documents manifest an awareness that

supervision can include intrusions into their residence and, thus, have a severely diminished

expectation of privacy." Newton, 369 F.3d at 665 (internal quotations and citations omitted).

Such warrantless parole searches are deemed reasonable if the parolee gave consent as a

condition of his release and the conduct of the parole officer is rationally and reasonably related

to his duty to investigate parole violations so as to protect the public from the commission of

further crimes.  Id. at 666.  Here, the parole officer's entrance into Apartment F-6 was reasonably

related to his duties as Pabon's parole officer, since he knew that Pabon was a parole absconder.

See Newton, 369 F.3d at 666 (once parole officer had information that defendant possessed a gun

at his residence and used it to threaten others, officer was entitled to search defendant's

apartment).

Finally, the Court notes that recognizing a parolee's privacy interest in the home of a third

party "would grant the [parolee] broader rights in the third party's home than he would have in

his own home." Snype, 441 F.3d at 132.

Therefore, regardless of whether Pabon was living in Yager's apartment, an overnight

---

Amendment because the parole system presents "special needs" that justify a departure from the
traditional Fourth Amendment requirement, and that the police assistance did not change the Fourth
Amendment analysis since the duties of parole officers and police, although distinct, are frequently
intertwined and "it is difficult to imagine a situation in which a [parole officer] who entered a
residence with other law enforcement officials based on information about a [parolee's] illegal
activities . . . would not be pursuing legitimate . . . objectives.").

17

guest, or merely there temporarily, he did not have an expectation of privacy in Yager's

apartment that society would recognize as legitimate.[4]  His arrest was thus valid, and the

evidence seized from his person does not need to be suppressed.


### III.  Conclusion

Accordingly, it is hereby

**ORDERED**, that Defendant's Motion to Suppress (Dkt Nos. 19, 22) is **DENIED in its**

**entirety**; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**

DATED:       March 24, 2009
                    Albany, New York


_____
Lawrence E. Kahn
U.S. District Judge

---

[4] Because the Court finds that Pabon's challenge to the validity of his arrest lacks merit on several alternate grounds, the Court need not address whether Yager's consent to search was valid.

18